Cristal Casler
1917 Bois Ile Drive
Haslett, MI 48840
(517) 614-8573
CASLERC@NETPENNY.NET

Pro Se Plaintiff

FILED

APR 1 2 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

#5
ifp
np

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

C V 18 2187 MMC

| | |
|---|---|
| CRISTAL CASLER | ) Case Number: _____ |
| Plaintiff, | ) |
| vs. | ) COMPLAINT |
| | ) DEMAND FOR JURY TRIAL |
| DEPARTMENT OF THE INTERIOR | ) |
| RYAN ZINKE | ) |
| Secretary, Sued in his Official Capacity | ) |
| Defendant(s). | ) |

COMES NOW, Plaintiff, Cristal Casler, and for her complaint against the Defendant states and alleges as follows:

### I.  PARTIES

1.    Plaintiff, Cristal Casler (hereinafter "Casler") is a female citizen and resident of the United States, and Ingham County, State of Michigan, and is Caucasian.  At all times relevant to this complaint, Plaintiff was employed by the National Park Service, a Bureau of the Department of the Interior.  Plaintiff was a Term Employee, whose term of employment was not renewed on or about September 30, 2013.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

PAGE NO.  Page 1 of 17

1    2.      Defendant, United States Department of the Interior (hereinafter "Agency"), is a Cabinet-

2    level agency that manages America's vast natural and cultural resources.  The Agency employs

3    approximately 70,000 people through nine technical bureaus, including the National Park

4    Service, and is headed by the Secretary of the Interior.  The National Park Service is a Bureau of

5    the Department of the Interior and is charged with preserving the natural and cultural resources

6    of the United States for the enjoyment, education, and inspiration of this and future generations.

7    The name of the organization where Casler worked at the time that she was subjected to

8    discrimination was the National Park Service, Golden Gate National Recreation Area, at

9    Building 201, Fort Mason, San Francisco, California 94123-0022.

## II.  JURISDICTION

11   3.      This action is brought to remedy discriminatory acts pursuant to Title VII of the Civil

12   Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended.

13   4.      Jurisdiction of this Court is invoked pursuant to its original jurisdiction over cases and

14   controversies arising under federal law, pursuant to 28 U.S.C. § 1331.

## III.  VENUE

16   5.      Venue herein is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3), and under

17   28 U.S.C. § 1331.  Defendant. United States Department of the Interior, and the National Park

18   Service Bureau, exist under the laws of California.  The alleged unlawful and wrongful acts of

19   discrimination were committed in the Golden Gate National Recreation Area, in San Francisco,

20   in the Northern District of California.

## IV. INTRADISCTRIC ASSIGNMENT

22   6.      This lawsuit should be assigned to the San Francisco Division of this Court because a

23   substantial part of the events that give rise to this lawsuit occurred in San Francisco.

## V.  PROCEDURAL REQUIREMENTS

25   7.      Plaintiff filed a formal complaint of discrimination on or about November 8, 2013,

26   complaining of acts discrimination based on her gender.

27   8.      On or about June 24, 2014, Plaintiff elected a hearing before an Equal Employment

28   Opportunity Commission Administrative Judge.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial     CASE NO.: _____

9.      On September 25, 2014, the Administrative Judge issued a Case Management Order and acknowledged receipt of Plaintiff's complaint.

10.     On October 26, 2015, the Agency submitted a Motion for Summary Judgment.

11.     On November 4, 2015, Plaintiff responded to the Agency's Motion for Summary Judgement.

12.     On February 23, 2016, the Administrative Judge issued a Decision dismissing Plaintiff's complaint and granting the Agency's Motion for Summary Judgment.  The Agency adopted the Administrative Judge's Decision and issued its Final Order on March 10, 2016.

13.     On April 8, 2016, Plaintiff submitted an appeal to the Office of Federal Operations.

14.     On August 8, 2017 the Office of Federal Operations upheld the Administrative Judge's Decision.

15.     On September 12, 2017, Plaintiff requested reconsideration from the Office of Federal Operations.

16.     On January 22, 2018, Plaintiff received the Office of Federal Operations' Decision, dated January 18, 2018, denying her Request for Reconsideration and providing her the right to file in federal court.

17.     Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title VII, and the jurisdiction of the Court is proper pursuant to 42 U.S.C. § 200e(f)(3) and under 28 U.S.C. § 1331.

## VI. GENERAL ALLEGATIONS

18.     At all times relevant hereto, Plaintiff, Cristal Casler, was employed by the National Park Service, a Bureau of the United States Department of the Interior, in the Golden Gate National Recreation Area, in San Francisco, California.

19.     At all times relevant hereto, Defendant, United States Department of the Interior, is a Federal government Agency, doing business in the Northern District of California.

## VII.   FACTS

20.     On June 19, 2011, Plaintiff, Cristal Casler, began working as a GL-0025-7 Law Enforcement Park Ranger for the National Park Service at Golden Gate National Recreation

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial __   CASE NO.: _____

PAGE NO.  Page 3 of 17

Area. Approximately six (6) months later, Complainant was promoted to a GL-0025-9. By the time Complainant left the Agency, she had been promoted to a GL-0025-9, Step 2.

21. When Casler was hired, she was told that she would work a 4/10 schedule, meaning that she would work four (4) ten (10) hour days per week.

22. From January 1, 2012 through February, 2013, Casler's first level supervisor was Mr. Xave Agnew.

23. From February, 2013, through August 1, 2013, the majority of the relevant time period, Casler's first line supervisor was Mr. Michael Yost, a Law Enforcement Park Ranger with the Agency, who served as an Acting Supervisor from approximately February, 2013, through June, 2013.

24. From August 1, 2013, until Casler's contract was not renewed on September 30, 2013, Mr. Scott Larson, Supervisory Park Ranger served as Casler's first level supervisor.

25. At all times relevant to this complaint, Deputy Chief of Law Enforcement and Emergency Services, Randolph "Randy" Lavasseur served as Casler's second level supervisor.

26. At all times relevant to this complaint, Mr. Kevin Cochary served as the Chief Ranger, and Casler's third level supervisor.

27. At all times relevant to this complaint, Mr. Frank Dean served as the Superintendent and Casler's fourth level supervisor.

28. At all times relevant to this complaint, Mr. Matt Eng, a male Law Enforcement Park Ranger, was employed in the same position as Casler and was under the same supervisory chain as Casler.

29. At all times relevant to this complaint, Ms. Rachel Lewis, a female, was employed as a Law Enforcement Park Ranger. Her first level supervisor was Ms. Matthew Wallat and her second-level supervisor was Mr. Randy Lavasseur.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial   CASE NO.: _____
PAGE NO. Page 4 of 17

30.    At all times relevant to this complaint, Ms. Kelly Maples, a female, was employed as a Law Enforcement Park Ranger. Her first level supervisor was Mr. Matthew Wallat and her second level supervisor was Mr. Randy Lavasseur.

31.    At all times relevant to this complaint, Mr. Ryan Wright, a male, was employed as a Law Enforcement Park Ranger. During the relevant time period, in July, 2013, when Mr. Wright had a no-call, no-show for a shift and received no discipline or AWOL, his first-line supervisor was Mr. Michael Yost and his second-line supervisor was Mr. Randy Lavasseur.

32.    At all times relevant to this complaint, Mr. Matt Crabtree, a Caucasian male, was friends with Mr. Randy Lavasseur. Immediately following the non-renewal of Casler's contract, Mr. Crabtree was hired to replace her.

33.    At all times relevant to this complaint, Mr. Marcus Koenen served as the Alcatraz Site Supervisor. He was not in an interpretive ranger role, but rather a supervisory role with oversight of the entire island of Alcatraz.

34.    Coinciding with Daylight Savings Time in the fall of each year, Casler's schedule changed to five (5) eight (8) hour days, and then changed back to a 4/10 schedule coinciding with Daylight Savings Time in the spring. This was Casler's schedule under two (2) prior supervisors, which was designed to ensure effective coverage for the park, and which Casler expected to continue.

35.    On February 27, 2013, Casler's Term Appointment was extended through September 30, 2013.

36.    In mid to late February, 2013, Mr. Michael Yost became Casler's first-line supervisor.

37.    On or around February 22, 2013, Mr. Yost informed Casler that her schedule would be changed to keep her on a 5/8 schedule year-round. Mr. Yost told Casler that this directive came from Marcus Koenen, the park supervisor, with whom Casler had established a good relationship

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____
PAGE NO.  Page 5 of 17

over the previous two years. Casler inquired to Marcus Koenen as to the necessity of the schedule change.

38.     Sometime thereafter, Mr. Koenen brought up Casler's concerns with the schedule in conversation with Michael Yost.

39.     On or around February 22, 2013, Michael Yost stated to Casler "Hey, I know you went to Marcus about your schedule and you shouldn't do that anymore because I'm your boss." This was Mr. Yost's first comment to Casler about staying within her chain of command.

40.     On March 6, 2013 Casler, in a meeting with several of her superior officers at the Golden Gate National Recreation Area, presented a proposed schedule that was tangentially related to this same scheduling issue.

41.     During this meeting, Michael Yost made a comment about Casler staying in the chain of command, which Casler perceived as an additional and unwarranted reprimand. In giving his deposition in connection with Casler's Equal Employment Opportunity ("EEO") Complaint, Mr. Yost asserted that he was only providing a reminder, and that he did not believe that Casler had done anything wrong during this meeting.

42.     On March 27, 2013, Casler received notice by electronic mail that her schedule had been officially changed. The notice Casler received did not contain a reason for the change, as required by Article 7, Section 2 of the Union Contract which provides, "when necessary to change a schedule, the employer will inform the employee of the reasons for the change."

43.     Later that day, Superintendent Frank Dean approached the Casler and initiated a conversation during which Mr. Dean inquired about her work, and she mentioned her schedule, but assured him that it would be okay.

44.     On March 28, 2013, the day after Casler spoke with Mr. Dean, Mr. Yost confronted Casler and verbally threatened and berated her. Mr. Yost told Casler that he was upset that

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial     CASE NO.: _____
PAGE NO.  Page 6 of 17

1  superintendent Dean has inquired as to Casler's schedule and told her that he was going to
2  reprimand her for going outside of her chain of command in speaking to Mr. Dean about her
3  schedule change.  Mr. Yost made the threat of reprimand despite Casler making it clear that Mr.
4  Dean had approached her and solicited the information.  Mr. Yost further threatened Casler by
5  stating that the National Park Service did "not have to renew her employment contract come
6  June."
7

8  45.   In his deposition in connection with Casler's EEO Complaint, Mr. Yost admits that he
9  was upset with Casler because he believed that she had approached Superintendent Dean and
10  spoke to her without verifying the facts.  Mr. Yost clarified on the record that he has since been
11  apprised of the issue and admitted that Casler did not breach the chain of command in speaking
12  with Superintendent Dean on March 27, 2013.
13

14  46.   Upset from this confrontation, on April 4, 2013, Casler spoke with Chief Ranger Kevin
15  Cochary, and explained that she had not been trying to go outside the chain of command in
16  speaking with Superintendent Dean.  During this conversation, Kevin Cochary made a comment
17  to the effect of "I'm under the impression that you're not a team player because of the way you
18  brought the union into your schedule change situation."
19

20  47.   Later that day, Deputy Chief Ranger Randy Lavasseur confronted Casler and told her
21  that, in spite of her great performance at her job, she was in danger of being terminated for
22  breaking the chain of command and requesting that her schedule remain the same.  Mr.
23  Lavasseur further accused Casler of causing turmoil in the workplace.

24  48.   In response to Mr. Cochary's threatening comments made on April 4, 2013, Casler filed
25  an Unfair Labor Practice charge.  Mr. Cochary was found to have made statements that tended to
26  interfere with protected union activities of Golden Gate NRA employees.  In response, the
27  Agency was required to place postings regarding the incident at Agency facilities.
28

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

PAGE NO.  Page 7 of 17

49.     On April 25, 2013, Mr. Yost confronted Casler about not calling into work on April 24, 2013, when she missed a shift she had been scheduled to work. However, Casler had called into the Radio Dispatch for the National Recreation Area the night prior to this shift to inform them of her absence. Because she was doing so at 12:30am, dispatch was the best choice to ensure that the National Recreation Area staff was informed of her absence.

50.     Mr. Yost admits that this Radio Dispatch was the communication center for the National Park Service. Mr. Yost further admits that Casler did call into dispatch, and that it was their error, not Casler's that resulted in the information failing to reach him in a timely manner.

51.     "Calling –in" in a relatively informal manner was in keeping with the established procedures that Casler had practiced for the previous two years under the supervision of Xave Agnew.

52.     Mr. Yost, upon becoming Casler's first-line supervisor, provided that he was neither aware of any specific policies under which Complainant had been instructed to "call-in," nor had he communicated, at any time, a particular preference or means for doing so to Casler. Furthermore, Mr. Yost admitted that, because he had not directed Casler as to any specific procedures for calling in, Casler had no reasonable reason to believe that calling dispatch was inappropriate.

53.     On May 9, 2013, Casler was issued a Letter of Reprimand for failing to show up for work on April 24, 2013, and failing to properly call in. Mr. Yost was the management official responsible for issuing the Letter of Reprimand.

54.     Mr. Matt Eng, a male term Law Enforcement Ranger supervised by Mr. Yost, regularly called into dispatch if he needed to call in and inform someone that he would be out, without problem.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial   CASE NO.: _____

PAGE NO. Page 8 of 17

55.    On May 7, 2013, Casler was contacted by Mr. Yost by telephone on a day when Mr. Yost was not working.  Mr. Yost informed Casler that he had received an email from another officer asking why she had not been in one location. Mr. Yost further stated to Casler that he had received a phone call from either the Chief Ranger or Deputy Chief Ranger asking why Casler was not on Alcatraz.  When Casler informed Mr. Yost that she had been instructed to work another detail by Mr. Kurt Veeck, the supervisor in charge that day, Mr. Yost seemed to take issue with her credibility, insisting on confirming it with Mr. Kurt Veeck and using an accusatory tone.

56.    None of Casler's male coworkers were subjected to similar scrutiny regarding their whereabouts or trustworthiness.

57.    On July 30, 2013, Casler was informed by her second line supervisor, Deputy Chief Randy Lavasseur, that she had 3.5 hours of Absent Without Leave ("AWOL") on her time card that had been put there by Michael Yost.

58.    Casler was not charged with or informed of this AWOL in any capacity which would have allowed her to contest the charge of AWOL and subsequent docking of her pay.

59.    In fact, Casler was not AWOL during the time she was marked AWOL and had used leave to depart early, with permission.

60.    Shortly thereafter, Casler learned that a comparator, specifically, Ryan Wright, a GL-0025-9 also under the direct supervision of Michael Yost, had missed a shift on July 16, 2014, and had not called in or indicated that he would be absent in any way.

61.    In his deposition in connection with Casler's EEO Complaint, when asked "If you were aware of an instance where Mr. Wright had not shown up for work, would he have been reprimanded in the same manner?" Mr. Yost responded "Yes." However, Casler had learned that

this comparator, Ryan Wright, who was a male, was not charged with AWOL or given any reprimand of any kind for missing his shift on July 16, 2014.

62.     On or about August 1, 2013, Mr. Scott Larson contacted Casler and informed her that her contract would not be renewed for the coming year, and that the decision was made by Deputy Chief Randy Lavasseur and Acting Supervisor Michael Yost.

63.     On or about August 16, 2013, in response to a request by Casler, the Agency provided that the justification for not renewing Casler's contract was misconduct and specifically cited her July 14, 2013 AWOL charge, which by the Agency's own admission, occurred as the result of an error. Apart from the erroneous AWOL charges, Casler had no history of any verbal or documented instances of misconduct during her employment at Golden Gate National Recreation Area.

64.     On or about September 19, 2013, Casler was called into a meeting with Mr. Larson and Mr. Lavasseur. As Casler did not know what the meeting was about, she asked whether the meeting would be disciplinary in nature and requested to exercise her Weingarten rights to have a representative present. Casler was denied representation, yet the meeting was to discuss her performance of her duties and resulted in negative information being placed in Casler's performance appraisal.

65.     Casler provides that as part of her development she had an Individual Development Plan which was designed to help her develop her skills and progress in her job. Such a plan was a standard part of each employee's development and Agency procedures dictated that each employee would have an Individual Development Plan. Casler provides that Mr. Yost and Mr. Larson both failed entirely to address her Individual Development Plan and prevented her from completing assignments as part of that Plan.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

PAGE NO.  Page 10 of 17

66.     Casler provides that Mr. Yost and Mr. Larson did not support her engagement in collateral duties, and would not allow her to complete them. Furthermore, Mr. Yost and Mr. Larson denied Casler the opportunity to maintain her front-country skills.

67.     Casler provides that from April 5, 2013 to September 30, 2013, she was not permitted to go to any of the approximately thirty (30) training courses offered in that time frame to maintain her law enforcement skills. Casler further provides that her male counterpart on Alcatraz Island was permitted to attend several training exercises and work front-country shifts during the same timeframe.

68.     Casler provides that from May 7, 2013, through September 30, 2013, she was not allowed to have any duties that took her off of Alcatraz Island, despite previously having had at least one (1) day per pay period off-Island to maintain front-country skills for the previous two (2) years.

69.     Casler provides that during her time under Mr. Yost's supervision, she made repeated requests for a new spring kit for her Agency-approved duty weapon, as hers was not functioning properly. Calser informed Mr. Yost that she was having a failure to feed multiple times when at the Agency shooting range, meaning that the gun would not fire despite being full of bullets. Mr. Yost never got this equipment for Casler despite it being necessary for Casler to perform her job duties as a Law Enforcement Officer. However, during the same time period, Casler's male coworkers were able to obtain new and replacement equipment without issue.

70.     Casler's position was non-competitively filled by a male employee, Mr. Matt Crabtree, who had previously worked at Lake Mead with Deputy Chief Lavasseur.

71.     No male Law Enforcement employees failed to have their contracts renewed in 2013. As far as Casler is aware, no male Law Enforcement employees failed to have their contracts renewed for the previous ten (10) years – the entire time that Term Employees had worked on Alcatraz.

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial     CASE NO.: _____
PAGE NO.  Page 11 of 17

1   72.   In 2013, Casler did not receive a mid-year Employee Performance Appraisal Evaluation.

2                        VIII.   **FIRST CAUSE OF ACTION**

3            **Gender Discrimination in Violation of Title VII, 42 U.S.C. § 2000e**

4   73.   Plaintiff repeats, re-alleges, and incorporates by reference every allegation contained in

5   paragraphs 1 – 72, above, as if fully set forth.

6   74.   Plaintiff, Cristal Casler, is a member of a protected class based upon her gender, female.

7   At all times relevant to the discrimination alleged herein, Casler provides that her gender was

8   observable and known by her supervisors and colleagues.

9   75.   Each member of Casler's supervisory chain admits being aware of her gender at all

10  relevant times.

11  76.   On February 22, March 6, and March 28, 2013, Mr. Yost, Casler's first level supervisor

12  instructed Casler to follow the chain of command in addressing concerns.  In doing so, Mr. Yost

13  frequently jumped to conclusions and disciplined Casler without learning all of the facts.  Further

14  complicating matters, Mr. Yost and Casler's work schedules typically overlapped only for a few

15  hours each week as Casler worked the day shift and Mr. Yost was assigned to the night shift.

16  This resulted in Casler reporting to multiple supervisors, depending on who was on duty while

17  she was at work.

18  77.   In further addressing the perceived problems with Casler's utilization of the chain of

19  command, Mr. Yost eventually conceded that Casler's actions were not prohibited and were not

20  problematic in any way.  However, Mr. Yost continued to discipline Casler for going outside of

21  the chain of command.

22  78.   Despite engaging in the same or similar actions, Casler's similarly situated male

23  colleagues were neither disciplined nor even addressed for going outside the chain of command,

24  resulting in Casler being treated significantly less favorably than her male colleagues.

25  79.   When Casler was hired by the Agency, she was told that she would work four (4) ten (10)

26  hour days per week.  Casler worked this schedule with only occasional and temporary changes

27  until her schedule was permanently changed on March 27, 2013.

28

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

PAGE NO.  Page **12** of **17**

1   80.    Despite the Agency's assertion that this change was made to ensure more efficient law
2   enforcement coverage on the island, none of Casler's similarly situated male colleagues were
3   forced to change their schedules. Furthermore, Casler presented an option to the Agency that
4   would allow for even greater efficiency in coverage for the island, while allowing her to keep her
5   4-10 schedule.

6   81.    In violation of the Union Contract, Casler was further never provided a written reason for
7   the change to her scheduled.

8   82.    On March 28, 2013, when Casler attempted to address concerns about her work
9   environment, her supervisor threatened her that "her contract did not have to be renewed" and
10  further threatened to place a formal letter of reprimand in her file for going outside the chain of
11  command when she spoke to Superintendent Dean. In that instance, Superintendent Dean had
12  approached Casler and engaged her in conversation. Mr. Yost made this threat without learning
13  the facts of the event and was attempting to intimidate and threaten Casler.

14  83.    Casler is unaware of any of her similarly situated male colleagues being treated in a
15  similar manner.

16  84.    On March 28, 2013, and April 4, 2103, Casler further provides that she was subjected to
17  demeaning and threatening comments regarding her employment with the Agency. As
18  previously addressed, on March 28, 2013, Mr. Yost threatened Casler that if she did not stop
19  going outside the chain of command, her contract did not have to be renewed.

20  85.    On April 4, 2103, Mr. Kevin Cochary, the Chief Ranger and Casler's third level
21  supervisor, told Casler that she was not a team player because she had gone to the Union
22  regarding her schedule change. Mr. Cochary further threatened that Casler should consider
23  herself under a microscope.

24  86.    Casler is unaware of any of her similarly situated, male coworkers being subjected to the
25  same or similar threats.

26  87.    On April 25, 2013, Casler was advised that she had not called out properly when she
27  missed work on April 24, 2013, and that the incident would have to be documented.

28

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____
PAGE NO.  Page 13 of 17

88.     Casler was on scheduled leave through April 23, 2013, but her flight home was delayed resulting in her being unable to report to work on April 24, 2013. As soon as Casler realized this would be the case, she called the Dispatch Office to let them know that she would not be in for her assigned shift on April 24, 2013. Casler further instructed the Dispatch Office to let either Mr. Veeck, or Mr. Agnew know of her absence, depending on which supervisor was scheduled to be there at the time.

89.     Mr. Yost issued Casler a Letter of Reprimand for failing to call him directly in connection with her absence on April 24, 2013, despite the fact that Mr. Yost's duty shift did not start until 2pm, while Casler's shift began at 8am, and either Mr. Veeck or Mr. Agnew was Casler's assigned supervisor for her shift. Mr. Yost further admits that there is no set Agency procedure for calling in an absence and Casler had no reason to believe that calling dispatch would be inappropriate.

90.     In contrast, Mr. Matt Eng, a male Law Enforcement Ranger in Casler's same chain of command, provides that he frequently called into dispatch to report that he would be absent from work and was never disciplined for doing so. In another instance, Mr. Ryan Wright, a male Law Enforcement Ranger under Mr. Yost's supervision, was absent and entirely failed to call out to anyone yet received no discipline at all.

91.     Based on the disparate discipline issued to Casler, it is clear that her male colleagues were treated significantly more favorably than she was.

92.     In the spring of 2013, Casler requested a new Spring Kit and other law enforcement gear that she needed to perform her duties. Casler's male colleagues made similar requests. While Casler's male colleagues were given quick and easy access to the equipment they requested, Mr. Yost refused to ensure that Casler was able to obtain the same, necessary equipment.

93.     Throughout Casler's employment with the Agency, she was provided training and the opportunity to participate in off-island operations. Not only where these activities required by Casler's performance and development plan, they also aided her in improving her skills and becoming better at her job. Once Casler was placed under Mr. Yost's supervision, these

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial     CASE NO.: _____

PAGE NO.  Page 14 of 17

1   opportunities stopped immediately and completely, within one (1) week, for her, yet remained
2   available to her similarly situated male colleagues.

3   94.    On May 7, 2013, Casler was assigned to work off-island by the supervisor on duty, Mr.
4   Veeck. Prior to Mr. Yost becoming her supervisor, Casler was regularly assigned off-island
5   assignments to allow her to keep up her skills. When Mr. Yost, who was not working at the
6   time, learned that Casler was not on the island, he called her to inquire and became hostile when
7   stating that he would need to confirm her story. Casler provides that none of her male colleagues
8   were subjected to questioning when they were following supervisor orders, nor were they
9   immediately suspected of wrong-doing, or contacted by an off-duty supervisor about their work
10  while they were working.

11  95.    Despite the Agency requiring that each employee receive a mid-year performance
12  evaluation, Casler was never provided with a mid-year performance evaluation in 2013. This
13  resulted in Casler not being advised of how the Agency was rating her performance. While
14  Casler later learned that male employees supervised by Mr. Yost did not receive mid-year
15  performance evaluations, Casler was the only employee whose contract was not renewed.

16  96.    On or about July 30, 2013, Casler learned that three (3) hours of Absent Without Leave
17  ("AWOL") had been placed on her time sheet and that she would need approval before working
18  overtime as a result. Upon further investigation, Casler learned that Mr. Yost has placed three
19  hours of AWOL on her time sheet when she used three (3) hours of administrative leave on or
20  about July 14, 2013. In taking that leave, Casler followed procedures correctly, ensured that the
21  island would be covered in her absence, and left a message for the day shift supervisor regarding
22  her plans. Upon learning that Casler had left early, Mr. Yost placed AWOL on her time card and
23  never informed her. By Mr. Yost's own admission, he later learned that Casler was not AWOL,
24  but did nothing to remove the AWOL that he had mistakenly placed on her timecard.

25  97.    Here, Casler was charged with AWOL by mistake, which Mr. Yost then failed to correct.
26  In contrast, Casler provides that she is aware of male colleagues who Mr. Yost failed to charge
27  with AWOL at all, despite the charges being warranted.

28

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial __ CASE NO.: _____

PAGE NO. __Page **15** of 17__

1    98.    On or about August 1, 2013, Mr. Scott Larson informed Casler that her contract would
2    not be renewed and that her last day with the Agency would be September 30, 2013. As the
3    reason for her non-renewal, the Agency cited the two (2) AWOL charges that were improperly
4    placed on her record by Mr. Yost.

5    99.    Each of Casler's similarly situated male colleagues had their contracts renewed, despite
6    having engaged in the same or similar, non-prohibited, conduct as Casler.

7    100.   After failing to renew Casler's contract, despite her successful performance in the
8    position, the Agency non-competitively filled the position with Mr. Matt Crabtree, a male
9    employee who had previously worked with Deputy Chief Lavasseur at Lake Mead.

10   101.   As a result of the Agency's actions, described above, Defendant is liable to Casler for
11   those violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

12   102.   The Plaintiff has suffered serious economic loss, and serious mental distress as a result of
13   this unlawful discrimination.

14   103.   Plaintiff is entitled to be fully compensated for all of the damages she has sustained.

15   104.   Plaintiff is now suffering, and will continue to suffer, irreparable injury and monetary
16   damages as the result of the Agency's discriminatory practices unless and until this Court grants
17   relief.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are in violation of Title VII
    of the Civil Rights Act;

(b) Enjoining and permanently restraining these violations of Title VII of the Civil Rights
    Act;

(c) Reinstating Plaintiff to her former position;

(d) Directing Defendant to take such action as is necessary to ensure that the effects of
    these unlawful employment practices are eliminated and do not continue to affect
    Plaintiff's employment opportunities;

(e) Compensating Plaintiff for her compensatory and actual damages;

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

1    (f) Removing all negative information related to this matter from Plaintiff's official

2         personnel file;

3    (g) Providing back pay from the date of Plaintiff's non-renewal to the present;

4    (h) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as

5         provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-6(k); and

6    (i) Granting such other and further relief as this Court deems necessary and proper.

7                   DEMAND FOR TRIAL BY JURY

8    Pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

9    trial of all of the issues in the above matter.

11    Date: 4-11-2018       Sign Name: _Cristal Casler_

12                     Print Name: _Cristal Casler_

TITLE OF DOCUMENT: Complaint and Demand for Jury Trial    CASE NO.: _____

PAGE NO.  Page 17 of 17